**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KIMBERLY A. GLASSMAN,

        Plaintiff,

    v.

UNITED STATES of AMERICA,

        Defendant.

_____/

No. C 02-5154 PJH

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This matter was tried before the court for a period of four days commencing May 31, 2005.  Plaintiff Kimberly Glassman has brought an action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), for damages incurred as the result of a December 2000 automobile accident in which a United States Postal Service employee, while driving a postal service vehicle, rear-ended the van she was driving.  Glassman was represented by her counsel Julia Parranto, and the United States (hereafter the "government") was represented by its counsel, Claire Cormier and Julie Arbuckle.

**FINDINGS OF FACT**

The court has attempted to "avoid commingling findings of fact with conclusions of law." Lieber v. Macy's West, Inc., 80 F. Supp. 2d 1065, 1066 n.1 (N.D. Cal. 1999).  To the extent this effort fails, "any conclusions that are inadvertently labeled as findings (or vice versa) shall be considered 'in [their] true light, regardless of the label that the . . . court may have placed on [them].'" Id., quoting Tri-Tron International v. Velto, 525 F.2d 432, 435-36 (9th Cir. 1975).

    A.    Kimberly Glassman

Kimberly Glassman is a 40-year-old woman who previously worked as a truck driver. She claims to have developed post-traumatic stress disorder ("PTSD") as a result of the

United States District Court

For the Northern District of California

December 2000 accident and that the disorder is so disabling that she will be unable to work in any capacity for the rest of her life.

### 1.   Personal History

Glassman grew up in Visalia, California, where she had a difficult childhood.[1] Glassman was born with a cleft palate, which took nine surgeries throughout her childhood to correct.  Glassman's family medical history includes a genetically-transmitted disorder known as Charcot-Marie-Tooth disease, which causes neurological degeneration.  Her father was and a brother is afflicted with the disorder.  Glassman does not herself suffer from the disorder, but nonetheless worries about contracting it.  Glassman's parents also fought frequently and separated when she was five.  About two or three years later, her father took her brother away and she did not see him again until she was twelve.  Meanwhile, her mother remarried, and her stepfather sexually abused her and another brother for several years when she was a teenager.  See, e.g., Def. Exh. A-69 at 7-8 (expert report of psychiatrist Dr. Mark Levy, summarizing Glassman childhood trauma).

Glassman was also involved in a number of traumatic vehicle accidents in her youth. As a child, she was in the car with her parents when they were hit by a drunk driver, and at another time she was in the car with her mother when it was struck by a driver who ran a stop sign.  Her mother was seriously injured.  Later at about age twenty one she was in an accident while riding her bicycle and suffered a vertebral compression fracture.  See, e.g., Def. Exh. A-69 at 8.  Several years later while driving her mother's car, she drove into an intersection when her vision was obstructed to see if any cars were coming and she was hit again.   Also while Glassman was in her early 20's, her grandmother and father were in an accident.  Her grandmother died from her injuries within a few days and her father was injured badly and never completely recovered from his injuries before his death two years later.  Id. at 9.

After Glassman completed the ninth grade, she left school and took the California High

---

[1]   "Glassman" is Kimberly Glassman's married name, which she adopted upon her marriage to her second husband, Stephen Glassman, in 1999.  For convenience, the court will refer to her as "Glassman" or "Kimberly Glassman" throughout this order.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  School Proficiency Examination, which she passed.  She left school in part because she was

2  teased by other students because of her cleft palate.  Glassman then attended the College of

3  the Sequoias for about one and a half years, and then left school altogether.

4      Glassman worked a number of odd jobs, including in the food industry, in retail

5  services, and in janitorial services.  Meanwhile, she learned how to drive a commercial truck,

6  and obtained her commercial license at the age of 18.  She began her trucking career hauling

7  produce from Oregon to South San Francisco and Shasta for two and a half years.  When she

8  was 25, she began hauling for the company Vine Hill Transport, for whom she worked for eight

9  years.

10      Glassman married her first husband, Steve Berant in 1987 or 1988, and they had two

11  children.[2]  They purchased a house together in Felton, California when she was 23.  Berant

12  and Glassman separated some time in the mid-1990s, but Glassman kept the house.

13      After Glassman separated from Berant, she began working full-time for Vine Hill.  In

14  1997, she bought her own truck, and in 1998, she became self-employed.  While she was

15  working for Vine Hill, she earned 25% of the gross value of her load.  As a self-employed

16  trucker, she paid 20% of the gross load value to lease a trailer, paid a 5% broker fee to the

17  companies for whom she hauled, and retained 75% of the gross income.  However, as a self-

18  employed trucker, she also had to pay for the truck out of her own profits, whereas when she

19  worked for Vine Hill, they provided a truck.  In 1998, Glassman earned $76,462.05.  Pl. Exh.

20  108 at 2 (1998 IRS 1099-MISC form).  She was hoping to buy her own trailer, at which point

21  she would only need to pay the 5% broker fee and would get to keep 95% of the gross.

22          2.      Adult Medical History

23      Glassman has an extensive medical history.  In September 1987, before her marriage

24  to Berant, she was diagnosed with "acute anxiety and depression" after reporting that she was

---

26        [2]      Glassman failed to note this first marriage when speaking with her own retained

27  psychologist. See, e.g., Pl. Exh. 96 (expert report of psychologist Dr. Albert Kastl, calling Berant a "boyfriend"; Kastl confirmed on the stand that Glassman did not identify Berant as her ex-

28  husband in their interview).  On direct examination, Glassman failed to report this marriage as well, and only admitted to it when questioned on cross.

United States District Court

For the Northern District of California

1   "upset all the time."  Def. Exh. A-1.  She was also diagnosed with chronic pelvic pain the next

2   month, and in December 1987, she was involved in the bicycle accident referred to previously,

3   in which she fractured a vertebra in her lower back.  Def. Exh. A-2.  Glassman also suffered a

4   miscarriage in 1989.  Pl. Exh. 81 (medical records from 1987 and 1989).

5        The records resume again in 1995, when she was diagnosed with an ovarian cyst. [3]

6   Def. Exh. A-4.  At that time, she also reported that she experienced "chronic back pain" and

7   numbness in the legs.  Id.  The chronic back pain appears to have been persistent.  See Def.

8   Exh. A-5, A-6 (lower back pain approximately once a month throughout 1997); Def. Exh. A-8

9   (pain in hips in 1999).

10       In 1998, Glassman was in another car accident described above in which she was

11   broadsided, after which she reported pain in her neck and on her left side.  Def. Exh. A-7.

12            3.    1999-2000

13       In 1999, Glassman married her second husband, Stephen Glassman, and in

14   September of that year, gave birth to her third child.  Glassman worked until her son's birth,

15   and returned to work three months later, in December 1999.  Also in September, Stephen

16   Glassman began driving and hauling for Glassman's company (which was renamed from

17   "Kimberly and Sons" to "Kimberly and Stephen Glassman").

18       Starting around 2000, Kimberly Glassman's life became very stressful.  The

19   Glassmans were having financial problems, see, e.g., Def. Exh. A60, 61 (unpaid bills to

20   PG&E for $446.85 and GTE Wireless for $773.01), Def. Exh. A57 (Glassman's application

21   for MediCal), and Kimberly and Stephen were fighting.  Glassman described Stephen's

22   behavior as "emotional abuse" and both admitted that they threw things at each other during

23   these fights.  At one point during this time period, Stephen was arrested for domestic

24   violence, though the charges were later dropped.  Kimberly and Stephen also briefly

25   separated around this time, but later reconciled.

26

27          [3]     It appears some of Glassman's medical records are missing.  For instance, there
    are no records of the births of her first two children, in 1988 and 1991, both of whom were
28   delivered by cesarean section.

4

United States District Court

For the Northern District of California

1    In the middle of 2000, Glassman became pregnant with her fourth child.  While the

2  medical record for this pregnancy is thin, the pregnancy was apparently difficult, because

3  Glassman began receiving repeated prescriptions for painkillers such as Vicodin

4  (hydrocodone) and Tylenol with codeine, starting around September 2000.  Def. Exh. A-9

5  (record of Glassman's Rite-Aid prescriptions).

6    As her pregnancy progressed, Glassman was working only part-time.  In the MediCal

7  form she filled out in July 2000, she indicated that she expected to work only 60-80 hours a

8  month.  Def. Exh. A-57 at 9 (MediCal questionnaire).

9    In November 2000, Stephen stopped driving for their company, because he had gotten

10  into a dispute with Viviano Trucking, the company that subcontracted work to them.

11                4.    December 2000 Accident

12    On December 18, 2000, Glassman was driving to the post office in a Chevrolet

13  minivan, with her one-year-old son.  She was approximately five months pregnant at the time.

14  Glassman was wearing a seat belt and her son was strapped into a car seat.  As she was

15  merging from Route 17 onto Route 1 in Santa Cruz, traffic ahead stopped suddenly, and

16  Glassman braked.  A U.S. Postal Service truck behind Glassman was unable to slow down in

17  time, and rear-ended Glassman's van.  The truck was driven by Eduardo Sanchez, whom the

18  government concedes was acting within the scope of his employment at the time of the

19  accident.[4]

20    Glassman's van sustained moderate damage to the rear window, the rear bumper, the

21  tailgate door and the right tail lamp.  The postal truck suffered relatively minor scrapes to its

22  fender, but no other damage.  Glassman did not hit any cars in front of her, and her air bags

23  did not inflate.  See Pl. Exh. 1 (accident report); Pl. Exhs. 2-11; Def. Exh. A-11 (pictures of

24  accident).

25    Glassman testified that her hat flew off her head and she may have hit her left arm. At

26  the scene, she complained of neck and upper back pain.  She reported no other injuries.  See

27

28        [4]    Sanchez did not testify at trial because he has been deployed to Iraq.

United States District Court

For the Northern District of California

1   Pl. Exh. 79 (EMT report).  Glassman's son was uninjured, but was frightened and crying.

2   Glassman testified that she was terrified that her son and unborn child could have been injured

3   in the accident.

4       Glassman was taken to the hospital.  The doctors took x-rays of her neck and found no

5   signs of injury.  However, because of Glassman's pregnancy, the doctors would not x-ray her

6   back or conduct any other invasive tests.  She was prescribed Vicodin and sent home the

7   same day.

8       Glassman testified that after the accident, the pain, especially in her neck, back, and

9   shoulders, was excruciating.  "It felt like someone had taken a board and beaten me."

10  Glassman also described tingling throughout her left side, and the sensation of a "cold steel

11  rod" going up her back.

12      Both plaintiff's and defendant's experts at trial agreed that Glassman had suffered only

13  soft tissue injury as a result of the December 2000 accident.  Glassman testified that the pain

14  rendered her unable to work, and that she became terrified to drive.  Glassman also testified

15  generally that she was rendered at least partially unable to perform household chores.

16      About ten days after the accident, Glassman went to the Santa Cruz County Health

17  Services Agency, reporting severe back pain.  The doctor recommended that she not drive for

18  two weeks.  Def. Exh. A-13 (12/29/00 visit).  The pain continued through January, but

19  appeared to be improving at that time.  See, e.g., Def. Exh. A-14 (1/16/01 visit).  Glassman

20  confirmed this in her testimony.  Glassman also visited a chiropractor 22 times from January

21  3, 2001 to May 23, 2001.  Pl. Exh. 85.  The only additional doctors visits reflected by the

22  records are follow-up appointments.  See Pl. Exh. 113 (medical bills).

23              5.      April 2001 Accident

24      Despite her reported fear of driving after the December 2000 accident, Glassman

25  nonetheless continued to drive.  Glassman explained this behavior at trial as her attempt to

26  conquer her fear so that she could continue working as a truck driver once she was fully

27  recovered from her injuries.

28      On April 17, 2001, Glassman was driving down a private road near her home to run

United States District Court
For the Northern District of California

1    errands when her neighbor backed into her car.  She was nine months pregnant at this time.

2    Glassman went to the emergency room, reporting that she was reinjured and that the accident

3    had exacerbated the pain in her neck and back.  Her unborn child was uninjured.  See also

4    Def. Exh. A-15 (4/17/01 ER report); A-71 at 2 (Sutro expert report, Glassman reporting that

5    April 2001 accident caused recurrence of injury).  At trial, Glassman claimed that this accident

6    was very minor, not traumatic in any way, and that she suffered no lasting physical or

7    psychological effects from it.

8                        6.        April 2001-November 2002

9            On April 26, 2001, Glassman gave birth to her fourth child.

10           Starting around this time period, Glassman's medical providers began noting her

11   possible addiction to Vicodin.  See Def. Exh. A-16 (note from obstetrician on 5/3/01 stating,

12   "Patient is having many stressful events – moving with four children, loss of income, possible

13   addiction to Vicodin," and recommending referral to social worker).  See also Def. Exh. A-23

14   (2/22/02 report, Glassman requesting "some kind of pain relief," doctor noting "try to minimize

15   Vicodin").  During this time period after the April 17, 2001 accident, Glassman continued to

16   complain of pain which she attributed solely to the December 2000 accident.  Def. Exhs. A-

17   17, A-20, A-22, A-23, A-24, A-25, A-27, A-28, A-29, A-30; Pl. Exhs. 80, 82, 85, 87, 90 (from

18   5/01 to 12/02).  Notably, Glassman's treating physician, Dr. Randall Anselmo, stated on

19   August 26, 2002 both that "I am not going to treat her with narcotic painkillers," and that  "I

20   have encouraged her to get back to work, driving trucks, although I doubt that will occur since

21   she has an open lawsuit and a vested interest in remaining ill." Def. Exh. A-28.

22           Throughout this time, the Glassmans continued to have financial, marital, and personal

23   problems.  Glassman stopped making payments on her mortgage commencing around

24   January 2001.  At trial, she claimed that she had simply forgotten to make the payments, due

25   to the stress of the December 2000 accident.  Sometime in 2001, Glassman filed for

26   bankruptcy.  Pl. Exh. 76 (filings before bankruptcy court).[5]

27   ───────────────────────

28           [5]     At trial, Glassman denied having filed for bankruptcy, claiming only that she had sold her house and truck to repay her debts.

7

United States District Court

For the Northern District of California

1    Kimberly and Stephen separated again, and Stephen moved out of the house in Felton

2   around May 2002 and moved to Santa Rosa.  Around August 2002, Kimberly and the children

3   moved in with her friend David Peterson.  Peterson testified that at this time, he observed that

4   Glassman was drinking wine regularly at his home.  He also specifically recalled lending his

5   car to Glassman on several occasions but acknowledged that she had access to his keys

6   during the daytime when he was not at home.  Stephen Glassman testified that Kimberly

7   would drive to Santa Rosa regularly to drop off the children for visits.  Glassman, though,

8   testified that she remained very frightened of driving throughout this time and therefore drove

9   as little as possible.

10              7.    November 2002 Accident

11       On November 18, 2002, Glassman borrowed Peterson's car to drive herself and her

12  two youngest children to visit her grandmother in Visalia for Thanksgiving.  Glassman drank

13  two or three glasses of wine that afternoon over lunch before departing.

14       While driving Peterson's car that day Glassman was involved in a major accident.

15  According to her, she was rear-ended by a car, which bounced her car into a third car.  She

16  claims to have passed out just before the impact.  See Exh. A-41 (12/4/02 ER report).  The

17  police report, however, reports the responding officer's conclusion that Glassman was driving

18  approximately 35-45 mph when she hit a pickup truck ahead of her.  That driver then hit a third

19  car, which left the scene.  Def. Exh. A-38.  See also Def. Exh. A-40 (ER report, estimating

20  impact at 50-55 mph).  The front of Glassman's car was destroyed, the airbags deployed, and

21  the car burst into flames.  The pickup truck she hit was completely destroyed.  Def. Exh. A-38

22  (police report); A-39 (pictures of cars after accident).  The passenger in the pickup truck was

23  airlifted to a hospital for treatment.  Def. Exh. A-38.

24       Glassman claims that she was not physically injured in this accident, and that because

25  she had passed out at the time of impact, she was unaware of its severity and thus suffered no

26  psychological trauma from it either.  She obviously regained consciousness at the scene, as

27  reflected by her statements to law enforcement and medical personnel, and was able to

28  observe the results of the accident.  At the scene, Glassman complained of chest pain and

United States District Court
For the Northern District of California

1  was taken to the hospital where she was kept overnight for observation.  Def. Exh. A-38 at 3

2  (11/02 police report); Def. Exh. A-40 (11/02 ER report).

3      Glassman's blood alcohol level was determined to be .15%, and she was arrested for

4  felony driving under the influence, a charge to which she subsequently pleaded nolo

5  contendere.  Def. Exhs. A-43, A-44.  Glassman spent 11 days in jail (of a 60-day sentence),

6  and her driver's license was suspended for one year.  Additionally, she was ordered to

7  perform 44 days of community service, which she fulfilled by performing receptionist duties for

8  the nonprofit organization Fair Housing of Marin.

9      Glassman admitted that she was at fault in the accident, but also claimed that the

10  accident was caused because she had been over prescribed pain medication by her doctors,

11  and that she had mistakenly taken a double dose that afternoon.  Glassman continues to

12  maintain that she did not believe that she had drunk very much alcohol earlier that day.

13  Glassman also claims that the only reason why she pleaded nolo contendere to the DUI

14  charge was because she was unconscious at the time of the accident and did not know what

15  had actually happened that day.

16      The driver of the pickup truck later sued both Glassman and Peterson over the

17  accident.  Glassman claimed little knowledge of the lawsuit, and stated that it was her

18  impression that she had not been named in the suit and that it was primarily a dispute

19  between insurers.  The case was ultimately settled before trial.

20      Glassman testified that after the accident, she quit drinking entirely.  However,

21  Peterson stated in his deposition in the lawsuit filed against him that Glassman drank about as

22  much after the accident as she did before.  Stephen Glassman also called Kimberly's doctors

23  in December 2002 (after they reconciled) to report that "all she does is drink."  Def. Exh. A-42

24  (note in Glassman medical file dated 12/11/02).

25      A few weeks later, on December 4, 2002, Glassman returned to her regular physician,

26  Dr. Anselmo, complaining of chest pain and requesting narcotics.  Anselmo informed her that

27  he would not prescribe her any additional narcotic drugs, and noted in her file that "I do feel

28  that this patient has drug-seeking behavior."  Pl. Exh. 87.

**United States District Court**
For the Northern District of California

8.    Present Day

Glassman now lives in a trailer park in Marin County with her two younger sons.  While she and Stephen did reconcile shortly after the November 2002 accident, she has since separated from him again, and her two older sons have moved in with their father, Steve Berant.  The older children visit her once or twice a month.

As part of the bankruptcy proceedings, Glassman was forced to sell her truck and house sometime in 2003.  She made no money from their sale, despite the fact that she had over $100,000 in equity.

Glassman does not hold a valid driver's license at this time.  Furthermore, she has not yet completed the First Offender DUI Education Program she is required to complete as a condition of her probation.  Thus, she remains ineligible to obtain a driver's license.

Glassman has not attempted to look for another paying job since the 2000 accident. Glassman believes that her medical condition prevents her from undertaking any gainful employment.  Nonetheless, Glassman repeatedly stated that she has a strong desire to work again.

B.    Medical Evidence

Glassman reports that she continues to feel physical pain from the 2000 accident. Glassman also reports that she feels extremely anxious all the time, and that she cannot focus or concentrate.  All the medical doctors that have seen her confirm that she is extremely anxious and emotionally volatile, and that there is no physical cause for her pain  Pl. Exh. 78 (expert report of Dr. Miller, for plaintiff); Def. Exh. A-71 (expert report of Dr. Sutro, for defendant); Def. Exh. A-69 (expert report of Dr. Levy, for defendant).

Defendants concede that Glassman suffered soft tissue injury from the December 2000 accident, and that she suffered stress and anxiety as a result of being in an accident with a one-year-old in the car and while five months pregnant.  Glassman, though, contends that the accident caused not only soft tissue injury but triggered her PTSD, which will render her completely unable to work ever again, in any capacity.  Thus, the contested issues are whether Glassman suffers from PTSD, and if so, to what extent she is disabled by PTSD.

United States District Court

For the Northern District of California

1.   Glassman's Experts

a.   Dr. Miller

At trial, neurologist Dr. Jack E. Miller testified on behalf of Glassman.  Pl. Exhs. A-77, 78 (CV and expert report).  Miller conceded that he is not a psychiatrist or otherwise trained in psychiatry, but claimed expertise in psychiatric issues to the extent they were implicated in neurological diagnoses.

Miller testified that he has diagnosed Glassman with PTSD.  Miller's diagnosis is based on the following factors:  the trauma suffered by Glassman from being in the December 2000 accident while pregnant and with another child in the backseat; Glassman's continued sensitivity and emotionalism when recalling the event five years later;  Glassman's overall high levels of anxiety reflected by her rapid pulse and sweaty palms; her reports that she continues to think about that particular accident; and her continued reports of physical pain that cannot be substantiated by medical examinations or diagnostic tests.  Miller testified that PTSD is particularly probable when a mother perceives a threat to her child.  While Miller agreed that psychological or psychiatric therapy might have been effective earlier, at this point, Miller opined that Glassman's PTSD was now chronic and while therapy might ameliorate the symptoms, it would not cure the disorder itself.  In order for PTSD to be cured, it must be treated immediately following its onset.

Miller discounted defendants' experts' conclusions that Glassman had a somatization disorder (characterized by patients translating emotional stress into physical complaints), because Glassman did not show a prior history of anxiety or an extensive medical history for perceived ailments that had proven to be groundless.  Miller also discounted defendants' experts' conclusions that Glassman had abused alcohol or narcotic drugs, claiming that they had selectively chosen to highlight only the negative aspects of Glassman's medical file.  Miller stated that he believed Glassman's November 2002 accident was a lapse in judgment, but not a sign of alcohol-induced behavior.

Miller diagnoses PTSD in patients approximately once or twice a month.

United States District Court

For the Northern District of California

b.    Dr. Kastl

Dr. Albert Kastl, a psychologist, also testified for Glassman.  Pl. Exhs. 95, 96 (CV and expert report).  Kastl reported that he administered the Beck test and the Penn Inventory test on Glassman, and that she scored very high on both for PTSD, which was tested independently from anxiety disorders.  Kastl discounted objections raised by other psychologists that the Beck and Penn Inventory tests are susceptible to manipulation by test takers who stand to gain from a positive diagnosis, as merely one side of the debate.  He was firm in his belief that his testing and conclusions were accurate.

Kastl confirmed the diagnosis of PTSD that had previously been reported to him by other experts.  His diagnosis was based on Glassman's self-reported high levels of anxiety, self-reported flashbacks to the December 2000 accident, and self-reported ongoing efforts to avoid the scene of the accident.  He conceded that he did not take a detailed personal history from Glassman.  Kastl testified that the subsequent car accidents, in particular, the November 2002 accident, served only to deepen the PTSD caused by the December 2000 accident, because of Glassman's guilty feelings.

Kastl discounted defendant's experts' conclusions that Glassman has a personality disorder that encourages her to perceive herself as a victim of circumstance, claiming that personality disorders tend to be lifelong, and the medical record and Glassman's personal history did not support any previous diagnoses of personality disorder.  Kastl opined that Glassman's successful previous work history was contrary to a diagnosis of personality disorder as well.

2.    Defendant's Experts

a.    Dr. Sutro

Dr. Michael Sutro, an orthopedic spine specialist, testified on behalf of the defendant.  Def. Exhs. A-65, A-71 (CV and expert report).  After examining Glassman, he concluded that the range of motion in her neck and shoulders was normal, as was her grip strength.  Based on his review of the records, Sutro concluded that Glassman had suffered soft tissue injury from the December 2000 accident, which should have resolved within three to four months, but

12

United States District Court

For the Northern District of California

1    within six months at the latest, if Glassman performed the necessary stretching exercises and

2    other physical therapy.  Sutro noted in his report that Glassman stated that she was not

3    currently doing any stretching exercises, despite her reports of physical pain.  Sutro also

4    stated that his estimate did not take into account the possibility of re-injury in Glassman's

5    subsequent car accidents.

6        Sutro concluded that there was no physical reason why Glassman could not return to

7    work, but offered no opinion on Glassman's psychological state.

8            b.      Dr. Rosenberg

9        Saul Rosenberg, PhD, a forensic psychologist, also testified on behalf of defendant.

10   Def. Exh. A-64, A-70 (CV and expert report).  Rosenberg administered the PAI test, which he

11   testified was more reliable than the Beck and Penn Inventory tests because the PAI test is

12   controlled for self-reporting bias.  Under the PAI test, Glassman appeared not to have PTSD

13   but rather showed symptoms consistent with a somatization disorder, where people with a

14   lack of psychological insight manifest their emotional problems through physical complaints.

15       Rosenberg also opined that Glassman showed signs of a histrionic personality

16   disorder, which manifests itself in over-emotionality and a tendency to view herself as a victim

17   of circumstance rather than take responsibility for her own actions.  Rosenberg hypothesized

18   that Glassman was choosing to focus on the December 2000 accident as the cause of all her

19   current problems because she was not responsible for that accident, as opposed to the other

20   difficulties in her life for which she was at least partially responsible.  In support of this

21   hypothesis, Rosenberg noted Glassman's pervasive pattern of shifting blame onto other

22   parties for events for which she was either partly or wholly responsible, including the breakup

23   of her marriage, her financial difficulties, and the DUI accident in 2002.

24       Rosenberg also noted that despite Glassman's tendency to exaggerate her

25   shortcomings and minimize her strengths, her level of psychological functioning in the testing

26   was in fact quite high.  He opined that she had no mental impairments that would prevent her

27   from returning to work.

28       Rosenberg agreed that Glassman showed signs of an anxiety disorder, but opined that

United States District Court

For the Northern District of California

1  the anxiety disorder appeared to predate the December 2000 accident, noting particularly

2  repeated references in Glassman's medical history to her rapid pulse rate and other

3  indicators of anxiety in her medical record.

4                                    c.       Dr. Levy

5          Finally, Dr. Mark Levy, a forensic psychiatrist, testified for the defendants.  Def. Exhs A-

6  63, A-69 (CV and expert report).  Levy confirmed Rosenberg's diagnosis of somatization

7  disorder, and further discounted Glassman's experts' diagnosis of PTSD.  In supporting the

8  diagnosis of somatization, Levy noted in particular Glassman's long history of reporting vague

9  physical complaints at times of emotional stress, as seen in her medical records, especially

10 her continued complaints about "decreased sensation" in her body.  Levy explained that it was

11 not uncommon for people with extensive contact with the medical community in their

12 childhood, like Glassman, to associate medical attention with emotional support, leading them

13 to externalize their internal stress as otherwise-unexplained physical ailments.

14         In contrast, Levy noted that PTSD is a very rare disorder, and is found primarily in

15 people who have faced serious threats to their lives, such as war, plane crashes, or traumatic

16 sexual assault.  Factors tending to support a diagnosis of PTSD include: 1) a perceived threat

17 to one's life or to another's life; 2) perceived helplessness in the face of that threat; 3) a sense

18 of personal paralysis and shortened sense of the future; and 4) severe withdrawal from

19 personal relationships.  Levy opined that Glassman's situation did not rise to this level, noting

20 particularly that Glassman seemed extremely interactive in her personal relationships.

21         Levy also noted that the medical record supported a conclusion that Glassman was

22 abusing alcohol and narcotic drugs, and diagnosed her with possible alcohol abuse.  Levy did

23 not conclude that Glassman was an alcoholic or addicted to narcotics, but merely found that

24 she was drinking inappropriately high amounts of alcohol and taking inappropriately large

25 doses of narcotics during the time period in question.  He noted in particular that tests in 1999

26 showed that Glassman had elevated levels of GGT liver enzymes, which is an indication of

27 alcohol abuse, and also noted the repeated references in her medical file to her overuse of

28 Vicodin.

**United States District Court**
For the Northern District of California

1    Consistently with all the other experts, Levy also diagnosed Glassman with anxiety

2   disorder.  Levy agreed with Rosenberg that this anxiety disorder was long-standing and that it

3   predated the December 2000 accident.

4    Levy also agreed with Rosenberg that Glassman's personality seemed increasingly

5   organized around a self-perception of herself as a victim, and showed characteristics not only

6   of histrionic behavior (over-emotionality) but borderline personality disorder as well (emotional

7   volatility).  Like Rosenberg, Levy opined that the December 2000 car accident, in which

8   Glassman had no culpability, had become a "convenient focus" on which to blame all her

9   subsequent difficulties.  This, coupled with Glassman's tendency to exaggerate, explained her

10   current medical condition.

11    Levy thus concluded that Glassman's current psychological condition was neither

12   PTSD nor caused by the December 2000 accident, but rather, was an anxiety disorder and a

13   somatization disorder caused by a combination of her long-standing personality traits

14   combined with the stress in her personal life that she faced in the last four years coupled with

15   alcohol abuse.  Levy also concluded that Glassman was very intelligent and was cognitively

16   and psychologically capable of resuming a career.

17    C.    Conclusions Regarding the Medical Evidence

18    No treating physicians testified.  Instead, each party called experts retained solely for

19   the purpose of examining and evaluating Glassman for this litigation.  This is understandable

20   given that Glassman has not been diagnosed with and is not being treated for a physical

21   injury, nor is she being treated for any psychological condition.  All experts agree that while

22   Glassman claims to continue to feel pain from the December 2000 accident, any physical

23   injuries she suffered from that accident would have resolved in no more than six months, and

24   that the only injury she continues to suffer from is emotional.  The experts on each side have

25   reached, however, very different conclusions on the nature of the emotional injury, its cause,

26   and its likely duration.

27    With regard to the nature of the injury, Glassman's experts have diagnosed PTSD and

28   the government's experts have diagnosed anxiety and somatization disorders.  Both sets of

United States District Court

For the Northern District of California

1    experts necessarily disagree with the opposing experts' diagnoses.  With regard to the cause,

2    Glassman's experts, as does Glassman, attribute the PTSD solely to the December 2000

3    accident.  The government's experts, on the other hand, believe that Glassman's anxiety and

4    somatization disorders are rooted in her personality and medical history and that she has

5    simply focused on the December 2000 accident to the exclusion of the other stressors in her

6    life.  With regard to duration, Glassman's experts believe that the PTSD disables her to the

7    extent that she will never be able to work again as a truck driver or in any other capacity.  The

8    government's experts believe that Glassman is capable of resuming a career.

9         In order to find, as Glassman urges, that she is totally and permanently disabled from

10   working again, the court would have to first find that Glassman suffers from PTSD.

11   However, the court finds that the government's experts were, as a whole, more persuasive

12   than Glassman's, and finds that she does not suffer from PTSD and is not permanently

13   disabled from working.

14        This finding is based on a number of factors.  First with regard to the experts, the

15   government's experts are better qualified.  Both Drs. Rosenberg and Levy are trained in

16   forensic psychology and psychiatry, respectively, which according to them, involves the use of

17   psychiatry and psychology to determine the facts of a situation.  Whereas, Drs. Miller and

18   Kastl, who do not specialize in forensics but rather act as treating physicians, accept at face

19   value the statements made by their patients and attempt to treat a particular problem or

20   alleviate pain.

21        Additionally, the government's experts administered tests that took into account the fact

22   that Glassman was involved in litigation at the time of her self-reported symptoms and

23   controlled for any bias that might have existed as a result.  By contrast, Drs. Miller and Kastl's

24   reports rely almost entirely on symptons self-reported by Glassman in forming their

25   conclusions.  As a result, plaintiffs' experts came to a conclusion which is simply not credible--

26   that Glassman would have been so psychologically traumatized by the relatively minor

27   December 2000 accident that she would suffer PTSD so severe as to render her completely

28   unable to function in her life and unable to work in any capacity again.  Indeed, this

United States District Court

For the Northern District of California

1   unbelievable conclusion casts doubt on all the opinions rendered by the plaintiffs' experts.

2   The court thus finds that the defendants' experts provide a more objective and consequently,

3   persuasive diagnosis of Glassman's medical condition.

4          Similarly, with respect to Glassman's credibility, the court is disinclined to find that she

5   is as incapacitated as she claims.  It is undisputed that Glassman has had a difficult life

6   peppered with a number of traumatic events, and that she has been under a high level of

7   stress for quite some time.  In addition, the medical records reflect that Glassman has a

8   history of anxiety and unspecified physical complaints, consistent with the government's

9   experts' findings.  It is also undisputed that Glassman has been in quite a few car accidents in

10  her life, probably far more than the average person might experience.  In light of this history, it

11  is difficult to see how this one relatively minor accident in December 2000 would have the

12  catastrophic result that Glassman claims.  Glassman never developed PTSD from other more

13  serious accidents or from the other traumatic events in her life, though it does appear likely her

14  high level of anxiety was a result of these various life experiences.  Furthermore, Glassman's

15  personal history reflects that she is bright, capable, and quite resilient.

16         During the course of the trial, the court was able to observe Glassman and detect at

17  least some of the traits referred to by the government's experts, including extreme over-

18  emotionality and a persistent pattern of minimizing her own responsibility for setbacks in her

19  life and attempting to recast events in a light that would allow her to omit facts and details in

20  her life that she perceived as painful or embarrassing.

21         These factors, coupled with the basic implausibility of Glassman's claim of having

22  incurred PTSD from a relatively minor accident that is so severe that she can never work in

23  any capacity again – especially when compared with the significantly more major accident in

24  November 2002, from which Glassman claims she suffered no psychological damage at all –

25  persuades the court that the government's experts' conclusions are likely more accurate than

26  those of plaintiff's experts.  Accordingly, the court finds that Glassman suffered no long-lasting

27  psychological trauma from the December 18, 2000 accident and that she does not currently

28  suffer from PTSD.

**United States District Court**
For the Northern District of California

1

**CONCLUSIONS OF LAW**

2     A.     Liability

3         The government conceded that Sanchez, the postal worker driving the truck that struck

4 Glassman on December 18, 2000, was acting within the scope of his employment and

5 therefore the United States is liable, but only to the extent that a private actor would be liable

6 under the laws of the state of California. 28 U.S.C. § 1346(b)(1). The government conceded

7 liability as between it and Glassman but took the position that liability might be potentially

8 shared between itself and the two drivers whom Glassman reported had stopped suddenly on

9 the highway in front of her. However, because no evidence of the liability of those drivers was

10 produced at trial, the court finds only that the government bears complete liability to Glassman

11 for damages she sustained as a result of the December 18 accident. In the absence of

12 evidence of the liability of others, the court rejects the government's request to find

13 comparative fault.

14     B.     Causation

15         Because the government has conceded liability, it is therefore liable to Glassman for

16 damages, but only to the extent that Glassman's damages were caused by the December 18,

17 2000 accident, or from foreseeable consequences of it. See, e.g., Hardison v. Bushnell, 18

18 Cal.App.4th 22, 27 (1993) (any intervening events that the plaintiff cannot show were

19 foreseeable from the original tort must be considered supervening, which excuses the

20 defendant from all subsequent damages).

21         While Glassman claims now that the second accident did not result in any serious injury

22 or trauma, she reported at the time that she was re-injured and that the accident had

23 exacerbated the pain in her neck and lower back. Def. Exh. A-15 (4/17/01 ER report). See

24 also Def. Exh. A-71 at 2 (Sutro expert report, Glassman reporting that April 2001 accident

25 caused recurrence of injury). Thus, the April 17, 2001 accident is a supervening cause for

26 Glassman's physical injuries, and Glassman cannot be awarded reimbursement for medical

27 expenses or lost wages for any period beyond April 17, 2001.

28

**United States District Court**
For the Northern District of California

1   C.   Damages

2      Furthermore, damages may only be awarded based on losses that Glassman can

3   prove were reasonably suffered because of the accident.  See Piscitelli v. Friedenberg, 87

4   Cal.App. 4th 953, 989 (2001).  The report and opinion of Glassman's expert economist Barry

5   Ben-Zion were based on the assumptions that the December 2000 accident caused all of

6   Glassman's damages and that she would never be able to work again.  Because the court has

7   now found contrary to those assumptions, his opinion must be and is rejected.

8      The government argues, through its expert Sally White, that Glassman's damages

9   consist of lost wages, medical expenses, loss of household services, and general emotional

10  distress damages.  The court agrees that these damages are warranted, and examines each

11  of them in turn.

12      1.   Lost Wages

13     The evidence shows and the court finds that the physical injuries Glassman suffered in

14  December 2000 rendered her unable to work for up to 4-6 months (the time estimated by

15  Sutro for a full recovery from soft tissue injuries) and further, that she planned to stop working

16  upon the birth of her fourth child.  The court finds that Glassman has adequately established,

17  by her testimony about how long she worked before the birth of her older child, that she would

18  have worked until very near the birth of her fourth child, on April 26, 2001.  While defendant

19  argues that lost earnings should be calculated only to March 1, 2001, the date Glassman's

20  expert relied on in his calculations and which was tied to his expectation of her maternity

21  leave, the court finds more persuasive Glassman's testimony that she planned to work until her

22  son was born, particularly in light of the fact that she was already having difficulty paying her

23  bills and her husband had stopped driving for their company.  However, because Glassman

24  can only show direct causation form the December 18, 2000 accident until April 17, 2001, the

25  date of the second accident, the court thus awards lost wages for this period.

26     White determined Glassman's projected average monthly income in 2000 in

27

28

United States District Court

For the Northern District of California

1    determining her lost wages, and arrived at the figure of $1696/month.[6]  The court awards lost

2    wages damages for the time period of December 18, 2001 to April 17, 2001, or almost

3    exactly four months.  Thus, an award of $1696 a month for four months totals **$6784** in lost

4    wages.

5                    2.      Medical Expenses

6            All parties agree that Glassman suffered soft tissue injuries as a result of the

7    December 18, 2000 accident, which rendered her unable to work.  However, as previously

8    discussed, Glassman is entitled to damages for expenses incurred for treatment of injuries

9    directly caused by the accident.  Accordingly, she can only collect damages for her medical

10   expenses incurred up to April 17, 2001.

11           Because many of the medical providers accepted reduced payment through MediCal,

12   Glassman is only awarded the actual amount that was accepted as payment in full by the

13   providers.  Hanif v. Housing Authority, 200 Cal. App. 3d 635, 640 (1988).  These payments

14   are detailed in Pl. Exh. 113, and are as follows:

15

| Date | Provider | Amount |
| --- | --- | --- |
| 12/18/00 | Dominican Hospital | 72.74<br>11.62 |
| 12/18/00 | Radiology Medical Group | 8.32 |
| 12/29/00<br>1/12/01<br>4/6/01 | Santa Cruz Health Center | 165.85<br>165.85<br>165.85 |
| 1/3-<br>2/8/01 | Hinde Chiropractic | 1505.00 |
| 1/12/01 | Novacare | 145.00 |
| 1/16/01<br>6/12/01[7] | Dr. Glenn Harper | 99.45<br>29.32 |

24

25           [6]      The government's findings of fact state that White concluded that Glassman was

26   earning $1681 a month, but at trial, White testified that Glassman's monthly earnings were
     $1696/month.  This is confirmed in White's expert report, at Def. Exh. A-72.  The court thus uses

27   the $1696 number.

28           [7]      The government concedes that Glassman is entitled to collect for the June 12, 2001
     visit because Harper recommended a June follow-up visit on January 16, 2001.

| 5/21/01[8] | Paradigm Group | 1400.00 |
| 12/28/00-2/1/01[9] | Rite Aid Pharmacy | 109.92 |

Totaling these numbers, the court finds that Glassman incurred medical expenses of **$3878.92** from December 18, 2000 to April 17, 2001.

       3.     Loss of Household Services

     Glassman also claims she was rendered completely unable to perform household services as a result of the December 2000 accident. The government is willing to concede this issue, and suggests that the court award Glassman $1586/month for those services. Def. Exh. A-72. As previously discussed, Glassman can only show direct causation for her damages from December 2000 until April 2001, when the second accident occurred, and thus may only collect four months of damages.

     Glassman testified generally that she was unable to perform household services as a result of the December 2000 accident, but did not provide any specific information about what household services she was unable to perform. However, Glassman could not have been completely unable to perform household services throughout this entire time period, because she was capable of driving and running errands at the time of her second accident in April 2001.

     The court therefore that Glassman was approximately 75% incapacitated from performing household services over the four-month time period at issue here. Seventy-five percent of $1586 is $1189.50. The amount of $1189.50 per month from December 18, 2000 to April 17, 2001 equals **$4758.00.**

---

[8]     The government concedes that Glassman is entitled to collect for this May 21, 2001 visit, for her first post-accident MRI, because she had been unable to undergo an MRI at the time of the accident due to her pregnancy.

[9]     The government presumes that these prescriptions were used solely for accident-related purposes, even though Glassman was previously filling approximately the same number of prescriptions before the December 2000 accident.

1

        4.     General Damages

2

      Glassman claims that she suffered general damages in the form of emotional distress

3 from the accident as well.  The court finds that Glassman did indeed suffer emotional distress

4 as a result of the accident, especially given the fact that she was five months pregnant at the

5 time of the accident and had her one-year-old son in the car with her at the time.  While

6 general damages are difficult to quantify, the court concludes that a reasonable estimate of

7 Glassman's general damages is **$20,000**, more than four times the amount of her medicals

8 specials, and awards that amount.

9

        5.     Miscellaneous

10

      The government has already settled a property damage claim with the insurer of

11 Glassman's van, however, Glassman is awarded **$500** as reimbursement for the deductible

12 she paid.

13

                                                     **CONCLUSION**

14

      The court thus awards Glassman total damages of **$35,920.90**.  Judgment in this

15 amount shall be entered in favor of plaintiff and against defendant.  The clerk is ordered to

16 close the file.

17

      **IT IS SO ORDERED.**

18 Dated: July 15, 2005

19                                            _____

                                        PHYLLIS J. HAMILTON

                                        United States District Judge

20

21

22

23

24

25

26

27

28